## DECEMBER TERM, 1843.

### Oscar Hope *v.* S. W. Evans, *et al.*

Where the bill charged upon the defendant the introduction of negroes into this State for sale, which was positively denied by the answer, and proof in corroboration of the answer taken ; *held,* that proof of mere admissions of the party defendant, that he *had so introduced the negroes,* would not alone be sufficient to overthrow the positive denial of the answer, and the corroborative proof.

Proof of mere admissions of a party, unsustained by any other circumstances, should always be cautiously weighed ; because of their liability to be misunderstood, the facility of fabricating them, and the difficulty of disproving them.

Where a party has knowingly entered into an illegal contract, and has voluntarily made payments therein, he has no claim either in law or equity to recover back the money so paid.

E. sold H. a tract of land and negroes, some of the latter of which had been brought into this State, in violation of law, for sale ; H. made partial payments and filed his bill to rescind the contract of sale, which he averred was an entire one, on account of illegality ; *held,* that H. was entitled to no relief ; that the Court could not decree a repayment of the money already paid, and could not decree *a partial* rescission of the contract.

Oscar Hope, the complainant, filed his bill, alleging, that, in the year 1836, he purchased of Evans a large quantity of lands and a number of slaves by one entire and undivided contract, for which he agreed to pay said Evans the sum of thirty-six thousand dollars ; that, to secure the payment of notes given by him for this sum, he conveyed the same real and personal estate to the defendants, Pope and Hamer, in trust, to sell the same, on certain terms, in case of his default, and apply the proceeds to the payment of his debt ; that the whole of the debt has been paid, except the amount due on two notes, for the sum of forty-five hundred dollars each, due on the 1st of January, and on the 1st of April, 1841 ; that the trustees had advertised the land and slaves for sale, under the trust deed ; and complainant prays that they be restrained from so doing by injunction. Complainant alleges that five of said negroes, purchased by him of said Evans, named Abner, Patsy, Terry, and Silsy, and her child Jane, forming part of the consideration for which he was to pay said sum of thirty-six thousand dollars, were introduced into this State by said Evans in the year 1836, from the State of Tennessee, as merchandise, in violation of the constitution of this State.

The complainant insists that these facts render invalid the whole of said contract, and prays its rescission, on condition of his restoring the property to Evans, and accounting for rent and hire, and claims to have refunded to him the amount of his payments, with interest on them.

The answer of the defendant, Evans, admits the sale to the complainant, and the payments ; he denies, however, the introduction of the negroes for sale. He states that he had been a citizen of the State ever since A. D. 1831, and during all the period a slave-holder and cotton-planter. He admits the introduction of the five slaves, but states that they were for his *individual use ;* that he put them on the plantation and worked them with his other negroes, until he sold the whole to the complainant.

Edward D. Edwards testified that he sold to Evans, the plantation and negroes afterwards sold to Hope ; that Evans, after the purchase, brought negroes from Tennessee and put them on the place ; that Evans bought of him in the spring, but was not to get possession until October ; that when he took possession in October, the witness took his own negroes off, and Evans supplied their place with those brought from Tennessee ; that they were brought, so far as he knew, for Evans's own use, and not for sale ; that after Evans had taken possession of the place, he wanted to get off the contract, because he had not hands enough to work it properly, and that the witness sold him six more of his negroes, which were essential to give Evans a proper force ; that in the October in which he took possession of the place, Evans told the witness, he had seen a place on the Tallahatchie river, which he wished to buy, or had already bought, which suited him a great deal better than the place he had bought of witness, and that he, therefore, wished witness to let him off of the trade ; which, however, the witness refused to do, and Evans soon after sold to Hope. The witness testified further, that he had known Evans from his infancy ; that he was a man of education, had inherited a large fortune, and had never been, or been regarded by any as a negro-trader ; that immediately after the sale to Hope, Evans moved to the place on the Tallahatchie, and had lived there ever since.

Alvarez Bridges testified that Evans, before he sold to Hope,

offered to sell to him the land and negroes, which he afterwards sold Hope.

James W. Cusack testified, that, in the spring of the year 1836, Evans informed him that he had purchased of one Edwards a plantation in Yazoo county, which was the same subsequently sold by Evans to Hope ; that he purchased part, but not all, of Edwards's negroes, and that he would visit the State of Tennessee, during the then ensuing summer, and would then purchase as many negroes as would supply the deficiency, bring them to this State, put them on the plantation he had bought of Edwards, when he thought he would be able to sell both land and negroes at an advance upon their cost ; that Evans stated, that he expected, when he purchased of Edwards, to make a speculation out of the purchase, by supplying the deficiency of hands, and selling at an advance. Upon cross-examination, he stated, that the five negroes, when brought by Mr. Evans from Tennessee, were put upon the plantation with his other negroes, worked with them; treated like them, and, finally, sold with them ; and that Evans had been a citizen of this State, and property-holder, ever since the year 1831.

Samuel H. Galloway testified, that in the " forepart" of October, 1836, Evans' had offered to sell him the land and negroes, which afterwards he sold to Hope ; that about six of the negroes on the place were brought into Mississippi by Evans, for sale, as he learned from Evans ; that they were to be put on the land sold to Hope, for the purpose of selling with the land.

Upon cross-examination, he stated, that the negroes were introduced into the State by Evans, to supply the deficiency in force upon the plantation purchased by Evans of Edwards, occasioned by the withdrawal of Edwards's hands ; that the introduction of the negroes was for Evans's own use, and for the purpose of enhancing the value of the land, should he sell them together.

Upon this state of pleading and proof, a motion was made to dissolve the injunction obtained by Hope.

*Wilkinson,* and *Miles,* in behalf of the motion.

The depositions of all the witnesses prove, that Evans had, for a number of years before he sold the property to Hope, become a

citizen of the State, and during the whole time, the owner of considerable landed and negro property. And they all corroborate the answer of Evans, in every essential particular ; except that of Galloway, and his answer to the third cross-interrogatory of complainant, completely explains away his answers to the examinations in chief. The deposition of Edwards, from whom Evans purchased the property, places the transaction in its true light ; and shows conclusively, that defendant, Evans, is not one of those men whose property has been accumulated by an illegitimate traffic in human flesh and blood.

A motion is now made to dissolve the injunction on bill, answer, and proof.

In support of the motion, we contend that this case does not fall within the rule of law established by the Supreme Court, in its three several decisions reported in 5 How. Rep. In those cases the contracts were made for the purchase of slaves, confessedly introduced into this State for sale and merchandise, in violation (as it is said) of our constitution ; the introducers being non-residents, and professed negro-traders. Here, the vendor is an " *actual settler*," and introduced the negroes for his " *own use*," as he was permitted to do by the proviso contained in the negro-clause of our constitution. The answer denying the bill, will be taken for true, unless contradicted by two witnesses ; or by one witness, and corroborating circumstances. There is but *one* witness who contradicts the answer ; and he does not do so *positively* ; whilst all the *circumstances* of the transaction, as developed by the pleadings and proof, weigh strongly against the witness, and in favor of the answer.

Besides, it is insisted, that if the contract is void, it is only so to the extent of the five negroes introduced by Evans. Although the purchase is alleged and admitted to have been an entire one, we are yet to learn, that a failure of title to a *portion of personal property*, will, as in case of lands, where that portion furnished the main inducement in making the contract, authorize this Court to rescind the entire contract.

Further, it is contended, that even although the original contract between Evans and Hope were utterly void ; yet, Hope's subse-

quently conveying this property to Hamer and Pope, in trust for the payment of the debt due Evans, removes the illegal taint from it; and raises a new promise and undertaking on the part of Hamer and Pope, based upon a new and distinct consideration.

It has been held in England, 1 Bos. and Pull. 3, id. 295, that if A. is indebted to B. on an *illegal* consideration, and places money in the hands of C., to pay the debt, that B. may maintain an action against C. for the money. This doctrine has been expressly recognized by the Supreme Court of the United States. 11 Wheat. Rep. 258 ; 6 Cond. U. S. Rep. 298.

Now, it is contended, that the case at bar falls directly within the principles decided by the cases quoted. Admit that the contract between Hope and Evans, was *void*, for the sake of argument; yet, Hope placed in the hands of Hamer and Pope the property embraced in the trust deed, for the purpose of paying the debt due to Evans. They are bound by their acceptance of the trust to comply with its provisions, and sell the property, whenever Hope makes default in making the payments stipulated for.

*R. S. Holt*, for complainant.

The issue of fact raised is simple in the extreme, and the testimony adduced in illustration of it, equally free from complexity. It proves, conclusively, an intention on the part of Evans, as early as the spring of 1836, both before and after his purchase from Edwards, to bring to this State from abroad, as many negroes, as would, with those which he proposed to purchase, and which he did purchase from Edwards, make the complement of the plantation, and then to expose them to sale together, or in connection with the plantation.

The testimony of Galloway is equally clear as to these facts. He says, that he was informed by Evans, that six or eight of the negroes sold by him to Hope, " were brought into this State for sale," that they were to be put on the land sold to Hope, " for the purpose of selling with said land." That Evans supplied the deficiency of hands on the plantation, with the view of selling at a profit.

The circumstances proven are fully confirmatory of this direct

testimony. It is shown that Evans, under his contract, was not to take possession of the plantation until the 1st of October ; that he returned to this State, with the negroes which he introduced, about this time ; and that, ten days after he got possession, he was offering the whole property for sale. If the purchase was made by Evans for his own use, why so eager to sell as soon as he acquired title ? Does not his conduct prove that he still cherished the purpose with which he informed Mr. Cusack and Mr. Galloway that he had made the purchase from Edwards, and with which he determined to bring negroes from abroad ?

It is thus placed beyond all question, that Evans, in the spring of 1836, determined to bring from Tennessee to this State, negroes for sale, and that about the first of October, 1836, he did return to this State and bring the negroes, described in the bill and answer as brought from abroad, with him ; and, in pursuance of his original purpose, did sell them to Hope in connection with other property.

It is no doubt true, that Evans kept the negroes on the plantation, engaged in his service, from the time of his entering on the possession until he sold to Hope ; but it is impossible that this circumstance, whether accidental, or designed to evade the penalties denounced against an unlawful traffic, can relieve his contract from the imputation of illegality.

It was, and still is, true, that Evans introduced these negroes into this State from abroad, and with the intent to sell them, notwithstanding he may have engaged them in his own service, for a short time, before he was enabled to accomplish his purpose of selling.

The presumption arising, from Evans having engaged the negroes during this time in his service, that he brought them to this State for his own use, is completely overthrown by the positive proof that he brought them here, for sale, as merchandise.

The allegation of complainant, then, that five of the negroes, which constituted part of the subject of this entire contract, described in the bill, were introduced into this State as merchandise, by said Evans, in the year 1836, is fully sustained by the proof.

Such being the character of the contract between Hope and Evans, it is utterly void by the repeated decisions of the Supreme Court of this State. 5 Howard, 80, 110, 769. The second of

these decisions was on a contract identical in all its features with the one now under consideration.

*George S. Yerger*, on the same side.

This bill is filed to rescind a contract of sale for land and slaves. The contract was an entire one, and the entire price an aggregate one. Part of the slaves were introduced into the State, in 1836, for sale and merchandise.

The answer denies he brought the slaves for sale, and states he brought them for his own use.

But the proof is clear, that he brought them in for sale, and speculation, under a pretended shift or cover. The facts are, he purchased a tract of land (the same sold to complainant), in April, 1836, from Edwards (together with some slaves, but not all that Edwards worked). He purchased the place and negroes, with a view to speculate upon its immediate sale, but there not being hands enough to supply the place, he determined to go to Tennessee, to purchase additional hands, and put them on the place, and *then sell* all together. He accordingly did go, and immediately on his return, with the slaves, sold to complainant, to wit, in Nov. 1836. His intention to sell all (including those he intended to bring into the State) is proved by *Cusack.* The same witness also proves his object, in buying the place and the hands, was to supply the deficiency of hands, and then *sell*, at an advance.

He took possession, Oct. 1836, and sold in Nov. 1836.

But Galloway proves clearly his object. He says Evans told him, he brought the negroes from Tennessee for the purpose of *selling* them, by putting them on the plantation, and selling all together ; and that his object in buying them, was to sell the whole at a profit.

1. The Constitution prohibits the introduction of slaves for sale, whether introduced by a foreigner, or a citizen, unless the latter introduces them for his *own use*, i. e., to *plant with*, and use in planting. If he introduce them to sell, either by themselves or as an adjunct or aid to sell others ; or to make a speculation by *selling* them, with a plantation and other slaves, which he bought to

sell again, he is within the words, as well as the spirit, of the constitution. (5 How. 769.)

To permit a contrivance, or artifice, of this kind to prevail will point out the way by which the constitutional provisions can be evaded, and the policy of the State be overturned.

If the object was, to bring them into the *State to sell*, it matters not whether it was to sell together with others, or to put on a place, and sell all together, or sell separately ; it is not the mere act of introducing, but the *quo animo*, the intention with which they were introduced, that constitutes the prohibited act. If it was to *sell*, or speculate, it matters not how it is cloaked, or covered, it is void. It would be strange, if the policy of the State could be evaded by so shallow a subterfuge.

The contract in this case being entire, and not yet completely executed, and being against the direct prohibition of the fundamental law, is, according to most of the authorities, void *in toto.*

Sometimes a contract is illegal as to part, and good as to part ; particularly, when it is illegal by some common-law principle, is good as to the part which is legal, and bad for the residue. But when a deed is made, or a contract which is entire, and embraced in the same deed, or writing, is void by statute, it is void *in toto.* *Hyslop* v. *Clarke*, 14 John. Rep. 465 ; Farrer's case, 3 Rep. 78 ; Plowden, 54 ; *Cromwell* and *Horton* v. *Crutcher*, 4 Yerger, 541.

The modern cases, or some of them, say, if a contract is illegal for part, and legal for the residue, if the good can be separated from the bad, the court will do it ; but if it is *entire*, and incapable of separation, the whole is bad. *Vide* Chit. on Cont. 536, 537 ; 10 Pet. Rep. 358, 360 ; 8 Pick. 512.

In this case, it is impossible to separate the contract, unless it be to separate the land, which was sold for $18,000, from all the slaves, which were sold for $17,000. The latter cannot be apportioned, because of no separate value in each slave ; it was a lumping sale of all, and cannot be apportioned ; and, according to the above authorities, it is void for the slaves. If it is, a perpetual injunction must be granted.

CHANCELLOR. This case was submitted, on motion to dissolve the injunction therein, on bill, answer, and depositions.

In 1836, the complainant purchased of the defendant, Evans, a plantation and negroes, in the county of Yazoo, at the gross sum of $36,000, payable in instalments, at different periods thereafter ; and then conveyed the same property, in trust, to secure the payment of the several instalments as they fell due. In the spring of 1842, there being then a balance of nine thousand dollars due, on the purchase, the trustees advertised that they would sell the property under the deed of trust, to raise that sum. This bill was filed to enjoin that sale, and rescind the original contract, and to recover back the money paid thereon ; mainly on the ground, that a part of the slaves, which entered into the consideration of the contract, were introduced into this State, by the complainant, for sale, in violation of the law. This allegation of the bill is positively denied by the defendant, who states, that he was, at the time of the sale, and has since been, a citizen and cotton planter in this State, and that the slaves, referred to by the complainant, were purchased and brought to the State, and placed on his plantation, for his individual use. The deposition of Edwards, from whom Evans purchased the land, sold to the complainant, proves, that the additional slaves, brought into the State by Evans, were necessary for the cultivation of the land ; that the negroes, when brought here, were immediately placed upon it, and that Evans had been a citizen of this State for five years, at the time of the sale, and had never been known to engage in the business of buying and selling slaves. That when Evans returned with the slaves, from Tennessee, he told the witness, that he had bought, or rather wished to buy, a place in Tallahatchie county, and wanted Edwards to release him from the purchase made of him. This deposition shows, in the first place, that the purchase of the slaves by Evans, in Tennessee, was rendered necessary for the cultivation of the plantation bought of Edwards, and sold to the complainant, and, to that extent, shows that they were not purchased for sale. In the next place, it accounts for the sale that was immediately afterwards made to the complainant, by showing that Evans had found another place, which he preferred to the one sold. The facts, thus detail-

ed, are strongly in support of the answer, and the question is, Whether the positive statements of the answer, thus corroborated, are countervailed by the other proof in the case. The substance of the testimony of the other two witnesses, is, that Evans told them, after he purchased the plantation from Edwards, that he would bring some negroes from Tennessee, and supply the deficiency on the place; and that he thought he would be able, in that way, to sell the plantation and negroes, for an advance upon what he gave for it; and that, shortly after bringing the slaves to the State, he sold to the complainant. This is the whole of the testimony upon which it is attempted to deduce the inference (for it leads to nothing more), that a part of the slaves sold the complainant, in connection with the plantation, were brought here as an article of merchandise, and for sale. Is this testimony, leading to mere inferences, explained and weakened as it is by the testimony of Edwards, and opposed by the positive denial of the answer, to be taken as sufficient to fix upon a citizen, indirectly, the charge of violating one of the penal laws of the country? I think not. Proof of mere admissions of a party, unsustained by any other circumstances, should always be cautiously weighed, because of their liability to be misunderstood, the facility of fabricating them, and the difficulty of disproving them. Where it is sought to set aside a contract, on account of the alleged illegality of the consideration, the proof should be full, clear, and direct to the point, and not rest upon remote inference or doubtful deduction. But even if the allegation of the bill, in this particular, were fully and clearly proved, I should still not be satisfied, that the complainant is entitled to the relief which he asks. It is quite clear, upon both principle and precedent, that I cannot decree a repayment of the money, which the complainant says he has already paid, if the contract, as is alleged, be illegal.

The complainant, by his own showing, knowingly entered into an illegal contract, and afterwards made large and voluntary payments thereon. He is, then, a *particeps criminis*, and, as such, has no claim to recover back the money, either at law or in equity; the maxim, *volenti non fit injuria*, applies equally in both courts. (*Merwin* v. *Huntington*, 2 Conn. Rep. 209; 1 Salk. R. 22;

Douglass, Rep. 673 ; *Sprague* v. *Birdsall,* 2 Cow. Rep. 419 ; *Clark* v. *Dutcher,* 9 Cow. Rep. 674 ; *Greenwood* v. *Curtis,* 6 Mass. R. 381.) This latter case is worthy of some notice, because it is not very unlike the case before me, in some of its features. The plaintiff, in that case, brought a suit in Massachusetts upon a contract for the delivery of slaves. The Court held, that no recovery could be had, in that State, upon such a contract, being void by their laws. ( *Greenwood* v. *Curtis,* 4 Mass. Rep. 93.) The plaintiff afterwards brought an action of assumpsit to recover back the money which he had paid and advanced upon the faith of that contract ; when the same court held, that it was money voluntarily paid, on an illegal contract, and could not, therefore, be recovered back. It is a general rule, that where a party knowingly and voluntarily pays money, which at law could not have been recovered, he can have no remedy to recover it back. ( *Morris* v. *Tarin,* 1 Dallas, 148 ; *Bogert* v. *Nevins,* 6 Serg. and Raw. 369 ; 2 Conn. 209.) As, then, I cannot decree the money to be paid back, which has been already voluntarily paid, it would seem to follow that I should not disturb that portion of the contract which remains unexecuted ; as it is a well settled principle, that a court of equity will never decree a partial rescission of a contract ; and especially where, as in this case, the complainant insists that the contract is entire, and incapable of apportionment, and that the illegality, upon which the rescission is asked, goes to the whole consideration of the contract.

In the case of *Fitzroy* v. *Gwillim* (1 Term. Rep. 154), it was held, that where a party applies for a rescission of a contract on the ground of its illegality, the rescission must be total, for he should not be allowed to take any advantage under it. So in the case of *Johnson's heirs* v. *Mitchell's heirs* (1 Marsh. Rep. 227), the Supreme Court of Kentucky held, that an *entire* contract cannot be affirmed so far as it has been performed, and rescinded for the residue. In the case before me, the complainant has done acts, in the performance of the contract, which the Court, according to established precedents, cannot undo ; and as I cannot, according to the authorities referred to, make a partial rescission, the complainant would

Hope *v.* Evans, et al.

seem, by his own conduct, to have precluded himself from any relief in this Court. I am of opinion, therefore, whether I look to the facts, or the law, of the case, that the injunction should be dissolved.